1  BARRACK, RODOS & BACINE
   STEPHEN R. BASSER (121590)
2  sbasser@barrack.com
   JOHN L. HAEUSSLER (215044)
3  jhaeussler@barrack.com
   402 West Broadway, Suite 850
4  San Diego, CA 92101
   Telephone: (619) 230-0800
5  Facsimile: (619) 230-1874

6  [Additional counsel listed on signature page]

7  Attorneys for Plaintiffs

8

9

                    UNITED STATES DISTRICT COURT
10
                  SOUTHERN DISTRICT OF CALIFORNIA
11

12
   LOUIS AND SILVIA MARTINEZ, on          )   Case No. '08 CV 0499 L WMc
13 behalf of themselves and all other similarly )
   situated,                                )   CLASS ACTION COMPLAINT FOR:
14                                          )
              Plaintiffs,                    )   1. VIOLATION OF SECTION 1 OF THE
15                                          )      SHERMAN ACT;
          vs.                               )
16                                          )   2. VIOLATION OF CAL. BUS. AND
   FIDELITY NATIONAL FINANCIAL,            )      PROF. CODE § 16720, et. seq.;
17 INC., FIDELITY NATIONAL TITLE          )
   INSURANCE COMPANY, TICOR TITLE         )   3. VIOLATION OF CAL. BUS. AND
18 INSURANCE COMPANY, TICOR TITLE         )      PROF. CODE § 17200, et seq.; and
   INSURANCE COMPANY OF FLORIDA,          )
19 CHICAGO TITLE INSURANCE               )   4. UNJUST ENRICHMENT
   COMPANY, NATIONAL TITLE               )
20 INSURANCE OF NEW YORK, INC.,          )
   SECURITY UNION TITLE INSURANCE        )
21 COMPANY, THE FIRST AMEICAN            )
   CORPORATION, FIRST AMERICAN           )
22 TITLE INSURANCE COMPANY,              )
   UNITED GENERAL TITLE INSURANCE        )
23 COMPANY, LANDAMERICA               )
   FINANCIAL GROUP, INC.,               )
24 COMMONWEALTH LAND TITLE              )
   INSURANCE COMPANY, LAWYERS            )
25 TITLE INSURANCE CORPORATION,          )
   TRANSNATION TITLE INSURANCE           )
26 COMPANY, STEWART TITLE               )
   GUARANTY COMPANY and STEWART          )
27 TITLE INSURANCE COMPANY              )   JURY TRIAL DEMANDED
                                         )
28            Defendants.                 )

CLASS ACTION COMPLAINT
59893

1    Plaintiffs, Louis and Silvia Martinez, by their attorneys, on behalf of themselves and all

2 others similarly situated, brings this action for treble damages and injunctive relief under the

3 antitrust laws of the United States and based on statutes of the State of California against the

4 above named defendants, demand a trial by jury, and complaining and alleging as follows:

5 **I.    INTRODUCTION**

6    1.    From the consumer's point of view, title insurance differs greatly from other,

7 more familiar kinds of insurance.  For one thing, while automobile and homeowner insurance

8 policies protect consumers from an event that may occur in the future, title insurance offers

9 protection from events that might have occurred in the past.

10    2.    Most simply, title insurance is protection purchased against a loss arising from

11 problems that occurred in the past and may affect the title to the real estate that a consumer is

12 buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.

13 In fact, almost all title policies are based on a single set of form policies published and

14 maintained by the national trade association, the American Land Title Association.

15 Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide

16 coverage for title defects that the search uncovers, but rather to exclude coverage for any such

17 defects and therefore, reduce the real value of the title policy which is written to cover only

18 unknown defects in title at the time of issuance.  As a result, title insurance is a commodity

19 product.

20    3.    Even for the savviest of insurance consumers, the purchase of a title insurance

21 policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

22 paperwork and signings that culminate in the closing of a home purchase.  Consumers who

23 normally shop around for their insurance and carefully compare prices, typically emerge from

24 the closing on their new home holding an insurance policy that they know virtually nothing

25 about and that in all likelihood, they will never need.

26    4.    The title insurance market in California consists of a dozen carriers, ranging in

27 size from regional companies to national affiliates.  However, the market is dominated by four

28 groups of affiliated companies which, combined, sell over 90 percent of the title insurance

1    policies sold in California and which own and control the title plants in many California

2    counties that every title insurer must rely on in order issue title policies.

3        5.      Title companies, in marked contrast to property, casualty, life and other

4    traditional insurance carriers, choose not to market their products directly to the consumers who

5    pay for them.   Instead, the title insurance industry operates on what is termed a "reverse

6    competition" model.  Reverse competition means that title companies solicit business referrals

7    from the other major players in the home purchase scenario — real estate agents and agencies,

8    banks, lenders, builders, developers and others: middlemen or go-betweens.    The title

9    companies pay middlemen for these referrals in the form of direct payments, advertising

10   expenses, junkets, parties and other kick-backs and inducements.  In addition, middlemen such

11   as Windermere, John L. Scott and Caldwell Banker-Bain, who themselves control a significant

12   portion of the real estate brokerage market, take significant ownership stakes in local title agents

13   and affiliates of the major title insurers and thereby get a direct return in profit from the referral

14   of title business to the title agent whom they partly or wholly own.

15       6.      Reverse competition, as the term suggests, isn't a model that benefits consumers

16   through market-driven forces.  In fact, consumers are bypassed completely as title companies

17   spend nearly all of their marketing budgets "wining and dining" real estate agents, banks,

18   lenders, builders, developers and others in an effort to convince these middlemen to steer their

19   home-buying clients to their companies for their title insurance needs. .

20       7.      In some of the major markets in the United States, these same title insurers

21   collectively meet, and jointly set rates and file these rates with the applicable state insurance

22   authority.  The rates are not subject to any meaningful review or regulation.  The companies

23   agree to fix the price of title insurance far in excess of the risk and loss experience associated

24   with such insurance.  As a result of the joint agreement as to rates, competition is relegated to

25   the middleman.  As a result of their joint rate setting and agreement, no company competes on

26   price to the consumer.

27       8.      Having agreed to fix prices in states where joint rate setting occurs, the

28   companies agreed to not compete based on price to the consumer in other states, including

1  California, where regulation of filed rates is lax or non-existent. Thus, they agreed to set rates

2  at supra competitive prices and to compete based on offering inducements to middlemen. In

3  California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has

4  found an "astonishing number" of such inducements that are in violation of state law. However,

5  the OIC does not actively oversee rates, and, in fact, does not by its own admission have the

6  power to do so. The absence of regulation has allowed collusive behavior and excessive rates.

7        9.      In addition to paying inducements and kick-backs, the title companies and their

8  agents divide the market of real-estate middlemen through the use of Affiliated Business

9  Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant

10  ownership stakes in favored title insurance affiliates. The real estate brokers then reward their

11  associates for using the preferred insurance providers and lock-out independent title insurers.

12        10.      In this action, plaintiffs, on behalf of a Class of those purchasing title insurance

13  in California, seek damages arising from defendants' violation of the Sherman Act as well as

14  California statutory law.

15  **II.      JURISDICTION AND VENUE**

16        11.      This Complaint is filed and these proceedings are instituted under Sections 4 and

17  16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to

18  obtain injunctive relief and to recover treble damages and the costs of suit, including a

19  reasonable attorneys' fee, against defendants for the injuries sustained by plaintiffs and the

20  members of the Class which they represent by reason of defendants' and their co-conspirators'

21  violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1). As such, this

22  Court has jurisdiction pursuant to 28 U.S.C. §1331. This Court also has supplemental

23  jurisdiction pursuant to 28 U.S.C. §1367(a).

24        12.      Defendants transact business, maintain offices or are found within the Southern

25  District of California. The interstate commerce described hereinafter is carried on, in part,

26  within the Southern District of California, the conspiratorial acts herein alleged were carried on,

27  in part, in the Southern District of California, and plaintiffs purchased title insurance in the

28  Southern District of California.

III.    **PARTIES**

 A. **Plaintiffs**

  13. Plaintiffs, Louis and Silvia Martinez, are individuals residing in Chula Vista, California. During the Class Period, plaintiffs purchased title insurance directly from one or more of the defendants herein and have been injured by reason of the antitrust violations alleged.

 B. **Defendants**

  14. Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquarted at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National does business in California through one or more of its subsidiaries, including but not limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company. Fidelity National is registered to do business in California.

  15. Defendant Fidelity National Title Insurance Company ("FNTIC") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. FNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

  16. Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Ticor does business in California, is a licensed title insurance company in California and is registered to do business in California.

  17. Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation with its principle place of business at 601 Riverside Ave., Jacksonville Florida 32204. TTICF does business in California, is a licensed title insurance company in California and is registered to do business in California.

  18. Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

1 | 32204. Chicago Title does business in California, is a licensed title insurance company in
2 | California and is registered to do business in California.

3 |     19.    Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York
4 | corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida
5 | 32204. NTINY does business in California, is a licensed title insurance company in California
6 | and is registered to do business in California.

7 |     20.    Defendant Security Union Title Insurance Company ("SUTIC") is a California
8 | corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida
9 | 32204. SUTIC does business in California, is a licensed title insurance company in California
10 | and is registered to do business in California.

11 |     21.    The Fidelity family of title insurance companies (collectively, "Fidelity") —
12 | which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and
13 | SUTIC, and their affiliates — is engaged in selling title insurance to purchasers of commercial
14 | and residential real estate throughout the United States, including California. Nationally,
15 | Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to
16 | roughly $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA
17 | (defined below) and since TIRSA's inception have charged title insurance rates in New York
18 | that TIRSA collectively sets.

19 |     22.    The Fidelity family of title insurance companies and their affiliates are wholly-
20 | owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries,
21 | Fidelity National is a provider of title insurance, specialty insurance, and claims management
22 | services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of
23 | title insurance companies engaged in the conduct challenged herein with the approval and assent
24 | of defendant Fidelity National

25 |     23.    Defendant the First American Corporation ("First American") is a California
26 | corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First
27 | American does business in California through one or more of its subsidiaries, including but not
28 |

1  limited to, defendants First American Title Insurance Company and United General Title

2  Insurance Company.

3      24.    Defendant First American Title Insurance Company ("FATIC") is a California

4  corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC

5  does business in California, is a licensed title insurance company in California and is registered

6  to do business in California.

7      25.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado

8  corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112. UGTIC

9  does business in California, is a licensed title insurance company in California and is registered

10  to do business in California.

11      26.    The First American family of title insurance companies (collectively, "First

12  American") — which included defendants First American, FATIC and UGTIC, and their

13  affiliates — is engaged in selling title insurance to purchasers of commercial and residential real

14  estate throughout the United States, including California. Nationally, First American accounts

15  for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8

16  billion. First American Title was a founding member of TIRSA and since TIRSA's inception

17  has charged title insurance rates in New York that TIRSA collectively sets.

18      27.    The First American family of title insurance companies and their affiliates are

19  wholly-owned and controlled by defendant The First American Corporation. Through its

20  subsidiaries, First American is a provider of title insurance, business information, and related

21  products and services. First American had 2006 revenues of roughly $8.5 billion. The First

22  American family of title insurance companies and their affiliates engaged in the conduct

23  challenged herein with the approval and assent of defendant First American.

24      28.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

25  corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does

26  business in California through one or more of its subsidiaries, including but not limited to,

27  defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance

28  Corporation and Transnation Title Insurance Company.

29.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a Pennsylvania corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

30.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. LTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

31.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060. TNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

32.    The LandAmerica family of title insurance companies (collectively "LandAmerica") — which included defendants LandAmerica, CLTIC, LTIC and TNTIC, and their affiliates — is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California.    Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.  Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRS collectively sets.

33.    The LandAmerica family of title insurance companies and their affiliates are wholly-owned and controlled by defendant LandAmerica Financial Group, Inc. Through its subsidiaries, LandAmerica is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate. LandAmerica had 2006 revenues of roughly $4 billion.  The Land America family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval of defendant LandAmerica.

34.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77069. STGC does business in California, is a licensed title insurance company in California and is registered to do business in California.

35.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017. STIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

36.    The Stewart family of title insurance companies (collectively, "Stewart") — which includes defendants STGC and STIC, and its affiliates — is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States and California. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

37.    Together, defendants account for more than 85 percent of the title premiums consumers pay in California. Nationally, they account for more than 85 percent of title premiums, which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period, defendants charged California consumers in California virtually identical title insurance rates.

IV.    OTHER ENTITIES

38.    TIRSA is a voluntary association of title insurers licensed as a rate service organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its offices in New York City, which until recently were located at the same New York address of Fidelity Title.

39.    TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA also prepares and submits the New York Title

1    Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by

2    TIRSA's members.  The Insurance Department has never objected to any of the rates TIRSA has

3    collectively set.   Similarly, the California OIC has not actually held a public hearing or

4    conducted any other review or regulation of the title insurance rates in California for thirty

5    years.

6         40.    TIRSA's membership is comprised of defendant insurers and all other title

7    insurers that are licensed to issue policies in New York.  Currently, Fidelity, First American,

8    LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members.  As such, they

9    comprise a majority voting block which, according to TIRSA's by-laws, allows them to control

10   the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

11        41.    Various other persons, firms and corporations not made defendants herein have

12   participated as co-conspirators with the defendants in the violations alleged herein and have

13   performed acts and made statements in furtherance thereof.

14   **V.    CLASS ACTION ALLEGATIONS**

15        42.    Plaintiffs bring this action under Rule 23, and particularly subsection (b)(3), of

16   the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of all

17   persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants,

18   who purchased directly, from one or more of the defendants and/or their co-conspirators title

19   insurance for residential and commercial property in California during the four year period

20   preceding this lawsuit and who have sustained damages as a result of the conspiracy herein

21   alleged.  The number of potential Class members is so numerous that joinder is impracticable.

22        43.    Plaintiffs, as representatives of the Class, will fairly and adequately protect the

23   interest of the Class members.   The interests of plaintiffs are coincident with, and not

24   antagonistic to, those of the Class members.

25        44.    Except as to amount of damages each member of the Class has by itself

26   sustained, all other questions of fact and law are common to the class, including but not limited

27   to, the combination and conspiracy hereinafter alleged, the violation of Section I of the Sherman

28   Act (15 U.S.C. § 1) and the effects of such violation.

CLASS ACTION COMPLAINT                    9
59893

45. Plaintiffs, along with all other members of the Rule (b)(3) Class, were injured as a result of paying supracompetitive prices for title insurance in California. These supracompetitive prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

46. Members of the Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

47. Plaintiffs also bring this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule (b)(2) Class included all members of the (b)(3) Class, and all consumers who are threatened with injury by the anticompetitive conduct detailed herein.

48. Defendants have acted, continued to act, refused to act and continued to refuse to act on ground generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

49. Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers. They are so numerous that their joinder would be impracticable.

50. Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law or fact common to the class are the following:

- Whether defendants have engaged in the alleged illegal price-fixing activity and market allocation and division.
- The duration and scope of defendants' allege illegal price-fixing and market allocation and division activity.
- Whether defendants' alleged illegal price-fixing and market allocation and division has caused higher prices to plaintiffs and other purchasers of title insurance in California.
- Whether the Insurance Commissioner has actively supervised defendants' price fixing and market allocation and division.

51. Plaintiffs do not have any conflict of interest with other Class members. Plaintiffs' claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class. Counsel competent and experience in federal class action and federal antitrust litigation has been retained to represent the class.

52.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

53.     There will be no extraordinary difficulty in the management of the Class action.

## VI.     TRADE AND COMMERCE

54.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

55.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow of interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

56.     During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

57.     During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

58.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.     FACTUAL ALLEGATIONS

### A.     The Nature of Title Insurance

59.     Title insurance is one of the most costly items associated with the closing of a real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranged in 2005 from about $1,010 (for $250,000) property to $1,490 (for a $500,000 property). For more expensive homes and commercial properties, these prices are significantly higher. The amount spent on title insurance has risen dramatically over the past decade.

60.     Title insurance serves an important purpose.  It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

61.     Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance.  That decision is typically made for them by their lawyer, mortgage brokers, lender, or realtor.  Consequently, for most purchasers, the cost of title insurance is not challenged.  Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction.  By then it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction.  There is no shopping around.  There is no negotiation of price.

62.     This dynamic basically removes the sale of title insurance from the normal competitive process and any real competitive constraints, unlike the regular forces of supply and demand.  The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions.  And, they are certainly in no position to question the price.

63.     The most effective but illegal way for a particular title insurer to get business is to encourage those making the purchasing decisions — the real-estate middlemen — to steer business to that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are not even paying).  Rather is it through kickbacks in the form of finder's fees, gifts, meals, business serviced and other financial enticements.  Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers to compete and increase their business.

**B.     Price-Fixing in the Large Markets**

64.     New York is one of the several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.  There are two

1    principal cost components that go into TIRSA's calculation. One comprises the risk associated

2    with issuing the title policy. The other comprises the "agency commission" paid to title agents.

3        65.    The risk component covers the risk the title insurer bears for any undiscovered

4    defects in the title. Unlike property insurance, title insurance carries with it a very limited risk

5    of loss to the insurer. That is because title insurance protects against unknown *prior* events that

6    cause defects in title. With a proper search and examination of prior ownership records, any

7    such defects can and almost always are readily identified and excluded from the policy's

8    coverage. Consequently, the average claim payout on a title insurance policy in the United

9    States amounts to only about 5 percent of the total premium collected. This is very different

10    from property coverage (such as auto and home insurance) — which protects against *future*

11    occurrences over which the insurer has little to no control — where the average claim payout

12    amounts to about 80 percent of the total premium.

13        66.    The "agency commissions" component of the title insurance rate covers

14    payments made to title agents. Defendants have an ownership or management stake in many of

15    the title agencies to which these payments are made. A small portion of the payments is for the

16    search and exam of prior ownership records of the property being purchased to identify any

17    liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam

18    function does not involve the spreading or underwriting of risk, and title insurers typically

19    outsource this task to title agents.

20        67.    The remainder, and by far the bulk, of the agency commissions are comprised of

21    costs unrelated to the issuance of title insurance. These costs include kickbacks and other

22    financial inducements title insurers provide to title agents and indirectly (through title agents) to

23    the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use.

24    These payments have nothing to do with the issuance of title insurance and are made by the title

25    insurers merely to inflate their revenues and steer business their way.

26        68.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title

27    insurance premium is based on the so-called "costs" associated with the payment of agency

28    commission. Only 15 percent is based on costs associated with the risk of loss.

69.    TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value — proportional to property value or otherwise — to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

70.    There are other states in which the defendants overtly met and agreed to fix the rates for title insurance as part of a formal collective rate setting process.

**C.    TIRSA's Formation**

71.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supereme Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

72.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to "exercise[]sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

73.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the

1    collective rate-setting of certain state rating bureaus was improper because it was not actively

2    supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed

3    us that a state's rubber stamp is not enough. Active supervision requires the state regulatory

4    authorities' independent review and approval." *Id.* at 1139.

5         74.    Defendants formulated TIRSA's first rate manual and procedure soon after the

6    Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme

7    to get around the rigors of state oversight required by *Ticor*. They have done so by calculating a

8    single rate that comprises both risk and agency commission costs and by outsourcing to title

9    agents the agency commission costs. In this way, defendants avoid providing the Insurance

10   Department with any detailed breakout or backup for the bulk of the costs that make up their

11   collectively fixed rates.

12        75.    TIRSA merely submits an aggregated figure that is supposed to represent the

13   total agency commission costs. Embedded with this figure is the vast quantity of dollars that are

14   funneled to and through the title agencies as kickbacks, financial inducements and other costs

15   unrelated to the issuance of title insurance. Defendants' design in all of this has been to

16   effectively "hide" the cost basis for their artificially high and collectively fixed title insurance

17   premiums from the regulatory scrutiny that *Ticor* demands.

18   **D.    Lack of Regulatory Supervision and Authority in New York and
          Other States Including California**

19

20        76.    There is no provision under the New York Insurance Law for TIRSA to include

21   in its collectively fixed rates kickbacks and other agency commission payments unrelated to the

22   issuance of title insurance. Indeed, the New York Insurance Department has openly

23   acknowledged that it lacks the authority to review any agency commission payments. It has

24   likewise recognized that defendants' outsourcing of agency commission costs has prevented it

25   from performing a meaningful review of TIRSA's calculated rates. This was made clear at a

26   November 2006 public hearing the New York Insurance Department held — the first in 15

27   years — where it questioned TIRSA and its members on TIRSA's failure to provide the

28   Insurance Department with any backup or detail for agency commissions.

77.    At the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

78.    The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation.  The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs."  (Emphasis added.)

79.    Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive levels and earn profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and open competitive market.

80.    At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a reasonable premium.  However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function.  As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

81.    Through an independent investigation conducted over the past several years, the New York State Attorney General found that for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out in claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title

1    policy. These numbers show that title insurers' collectively fixed rates have resulted in profits

2    that are untethered to and vastly exceed the costs of producing such policies.

3         82.    The New York Attorney General's investigation further revealed that what was

4    largely driving these numbers were the kickbacks and other financial inducements defendants

5    were funneling to and through title agents to secure more business. As reported at the New

6    York Insurance Department's 2006 hearing, one title agency's financial statements revealed that

7    it spent more than $1 million of these so-called "agency commissions" on items identified as

8    "Christmas", "automobile expenses", "political contributions", "promotional expenses", and

9    "travel and entertainment". These expenses are not even remotely related to the issuance of title

10   insurance.

11        83.    The Washington State Insurance Commissioner's October 2006 report found

12   strikingly similar abuses in Washington. Violations were pervasive and the Commissioner

13   concluded that consumers were paying too much as a result.

14        84.    All of this "excess money" paid to title agents not only works to steer business to

15   defendants. It also serves to boost defendants' own profits through the inflated revenues they

16   obtain to cover these agency payments and through their ownership or management stake in

17   many of these agencies.

18        85.    Defendants are competitors in the sale of title insurance to consumers throughout

19   the United States. These title insurers have agreed and engaged in concerted efforts to (i)

20   collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in

21   their calculated rates agency commission costs, (iii) embed within these costs payoffs,

22   kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide

23   these supposed "costs" from regulatory scrutiny by funneling them to and through title agents

24   over which the government agencies have no ability or authority to regulate.

25        86.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of

26   the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

27   competition and questions about the reasonableness of prices including:

28

CLASS ACTION COMPLAINT                    17
59893

- • Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- • Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- • A number of recent investigations by HUD and state regulatory officials have indentified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- • As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- • In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87. The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to verse title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

88. Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89. In other words, as a direct result of these meetings where rates were agreed to, these same defendants agree, either expressly or tacitly, to not compete on rates in other states

1    as well.  To compete on rates in other states could and would imperil their ability to maintain

2    the agreed rate in states like New York.

3         90.    As in the case in New York, a lack of regulatory authority over rates created an

4    environment in which a conspiracy can and did succeed.  No agency was examining why all the

5    rates were virtually identical, and no agency was examining whether the costs associated with

6    these premiums were reasonable.  This is an environment which is conducive to price fixing.

7         91.    In California, there is a lack of regulatory authority and oversight over title

8    insurance companies.  The rates in California are not set as part of a deliberate state intervention

9    and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue

10    in this case went into effect without review.

11    **F.**    **Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

12
13         92.    In addition to the uniformity of rates, other facts suggest that is it more plausible
than not that rates have been set based on an agreement to fix prices.

14
15         93.    In theory, the chain of title should be documented back to its historic grant of
ownership centuries in the past.  Fear about a possible title defect in the distant past is widely

16
17    used as a justification by title agencies when convincing property buyers to purchase an owner
policy in addition to the lender policy, which is mandatory to secure a mortgage.  The title

18
19    agency, however, saves much time and money when the search is limited to one or two
transactions.  They rely on the insurance policy to cover the remote chance of missing an earlier

20
21    but still-valid claim.  If such a claim is asserted and survives the scrutiny of the title insurance
company's legal department, the expected cost of compensation is likely to be less than the sum

22
23    of added overhead costs of routinely tracing back every chain of title to the earliest registered
owner in the distant past.

24
25         94.    Title insurance industry officials tend to justify the large proportion of the
premium retained by the title abstract and settlement agency (from 60 to more than 90 percent)

26
27    by the alleged high cost of title searching back into the distant past.  In fact, a high proportion of
noncommercial properties are searched only through the most recent transaction.  No

28    information is available as to what proportion of claims originate in the distant past.  The

CLASS ACTION COMPLAINT          19
59893

industry has never published pertinent statistics.  It would have a marketing incentive to publish these statistics if the risk were significant; that it has not published these statistics indicates that the risk probably is only slightly greater than zero.

95.     Many U.S. homes have been resold three or four times in twenty-five years.  At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property.  It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

96.     Title searches have become less labor intensive, especially in large urban counties and cities.  More and more of the information is available online.  The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are not insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years.  The evidence is strong that the title insurance industry has achieved a remarkably high level of loss minimization.

97.     Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

98.     There is remarkable absence of rate changes by title insurers over the past five years, despite declining costs of production, increased number of transactions and increased revenue per transaction.  During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates.  The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates.  Again, this is indicia of an agreement not to compete based on price.

99.     As noted, the title companies engage in illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals.  These illegal rebates and kickbacks — a consequence of reverse competition — show that title

1   insurance rates are supra competitive and that some portion of the overcharge is passed from the

2   underwritten title company or title insurer to the referrer of business.

3       100.   A lack of competition and the ability to control prices is enhanced by the fact that

4   there were few title insurer entrants over the period from 1995 through 2005 and the number of

5   title insurer groups declined as title insurers acquired other title insurers.   There were few

6   underwritten title company entrants over the 2000 to 2005 period and new entrants were

7   controlled business arrangements whose addition to the market did not result in greater price

8   competition.

9       101.   Access to title plants can be a barrier to entry, but a larger barrier to entry exists

10  due to the established relationships between the entities that can steer the consumer's title and

11  escrow business and the entities who sell title insurance and escrow services.

12      102.   The title insurance market is highly concentrated — a few title insurers account

13  for the vast majority of title insurance sales — at both the statewide level and at the county level

14  in California.   For example, three title insurer groups account for 77.4% of the market at a

15  statewide level.   At the county level, each individual market was highly concentrated.   The

16  GAO found that First American and Fidelity had a market share of 66 percent.   Such a

17  concentration enhances the ability of companies to fix prices.

18      103.   The agreement not to compete based on price is also evidenced by the fact that

19  no company has marketed its services to consumers, the ultimate purchasers of the product.

20  This is in marked contrast to real insurance, for example, car insurance, where the companies

21  compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor,"

22  or Allstate's "good hands,' or the cute (to some) GEICO gecko promising low prices.

23  **VIII.   CLAIMS FOR RELIEF**

24                          **COUNT I**

25                  **Violation of the Sherman Act**

26      104.   Plaintiffs incorporate by reference the preceding allegations.

27      105.   Beginning at least as early as March 2004, and continuing thereafter to the

28  present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators

1  engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate

2  trade and commerce in violation of Section 1 of the Sherman Act.

3      106.    The aforesaid combination and conspiracy has consisted of a continuing

4  agreement, understanding and concert of action among the defendants and their co-conspirators,

5  the substantial terms of which have been:

6          (a)    to fix, raise, maintain and stabilize the price of title insurance throughout

7  California;

8          (b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title

9  insurance in California; and

10          (c)    to allocate and divide the market for title insurance in California.

11      107.    In the absence of proper regulatory authority and oversight, defendants' conduct

12  constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to

13  allocate and divide the title insurance market in California and is a *per se* violation of Section I

14  of the Sherman Act.

15      108.    Defendants' price-fixing, market allocation and division activity has been

16  continuous throughout the relevant damages period and has been renewed and reinforced

17  annually through submissions to the OIC of supposed cost and revenue information and its

18  periodic submissions of rate changes.

19      109.    Through their collective price-fixing, market allocation and division and

20  manipulation of the regulatory process, defendants have harmed competition by charging

21  consumers supra competitive prices for title insurance in California, evidenced in part by the

22  fact that the prices are uniformly higher than compared with the cost of providing the insurance.

23      110.    The aforesaid combination and conspiracy has had the following effects among

24  others:

25          (a)    price competition in the sale of title insurance has been suppressed,

26  restrained and eliminated;

27          (b)    prices for title insurance have been raised, fixed, maintained and

28  stabilized at artificially high and non-competitive levels; and

1          (c)      purchasers of title insurance have been deprived of the benefit of free and

2    open competition.

3          111.    During the period of the antitrust violations by defendants and their co-

4    conspirators, plaintiffs and each member of the Class they represent, have purchased title

5    insurance and, by reason of the antitrust violations herein alleged, paid more for such than they

6    would have paid in the absence of said antitrust violations.  As a result, plaintiffs and each

7    member of the Class they represent, have been injured and damaged in an amount presently

8    undetermined.

9                                            **COUNT II**

10                        **Violation of Cal. Bus. and Prof. Code § 16720, *et seq.***

11         112.    Plaintiffs incorporate by reference the preceding allegations.

12         113.    Defendants' conduct as set forth above is in violation of the Cartwright Act of

13   California (Cal. Bus. & Prof. Code § 16720, *et seq.*).

14         114.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially

15   inflated prices for title insurance and have suffered injury to their business and property.

16                                           **COUNT III**

17                        **Violation of Cal. Bus. And Prof. Code § 17200, *et seq.***

18         115.    The preceding paragraphs of this Complaint are realleged and incorporated by

19   reference.  Plaintiffs assert this claim for violations of California's UCL, Bus. & Prof. Cod §

20   17200, *et seq.*, on behalf of themselves and the members of the Class.

21         116.    Defendants' statements and representations constitute unfair, unlawful and

22   deceptive trade practices in violation of the UCL.

23         117.    All of the wrongful conduct alleged herein occurs and continues to occur in the

24   conduct of defendants' business. Defendants' wrongful conduct is part of a pattern or

25   generalized course of conduct that is repeated in the State of California on hundreds, if not

26   thousands, of occasions daily.

27

28

CLASS ACTION COMPLAINT                    23
59893

118.    Plaintiffs have suffered injury in fact and have lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance than they would or should have absent the conduct complained of.

119.    Plaintiffs request that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing their unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits realized by defendants as a result of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT IV

### Unjust Enrichment

120.    Plaintiffs incorporate by reference the preceding allegations.

121.    This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

122.    Defendants have received a benefit from plaintiffs and the Class members in the form of the prices plaintiffs and the Class members paid for defendants' title insurance.

123.    Defendants are aware of their receipt of the above-described benefit.

124.    Defendants received the above-described benefit to the detriment of plaintiffs and each of the other members of the Class.

125.    Defendants continue to retain the above-described benefit to the detriment of plaintiffs and the Class members.

126.    As a result of defendants' unjust enrichment, plaintiffs and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand:

A.      That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.      That the Court declare that the premiums charged are excessive under state law and order damages;

C.      That judgment be entered against defendants, jointly and severally, and in favor of plaintiffs, and each member of the Class they represent, for threefold the damages determined to have been sustained by plaintiffs, and each member of the Class they represent, together with the cost of suit, including a reasonable attorneys' fee;

D.      Each of the defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any matter, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition; and

E.      Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38, F.R.C.P., plaintiffs demand a trial by jury of the claims alleged herein.

DATED:  March 18, 2008

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
JOHN L. HAEUSSLER

STEPHEN R. BASSER

402 West Broadway, Suite 850
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:   (619) 230-1874

1
2      BARRACK, RODOS & BACINE
       GERALD J. RODOS
3      JEFFREY GITTLEMAN
       3300 Two Commerce Square
4      2001 Market Street
       Philadelphia, PA 19103
5      Telephone: (215) 963-0600
       Facsimile: (215) 963-0838
6
       Attorneys for Plaintiffs Louis and Silvia
7      Martinez
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT                    26
59893

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 148885    — SH
* * C O P Y * *
March 18, 2008
11:33:34**

**Civ Fil Non-Pris**
USAO #.: 08CV0499
Judge..: M. JAMES LORENZ
Amount.:                    $350.00 CK
Check#.: BC5842

**Total—> $350.00**

FROM: MARTINEZ V. FIDELTIY NAT'L
      FINANCIAL INC

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Louis Martinez
Silvia Martinez

**DEFENDANTS**

Fidelity National Financial, Inc., Fidelity National Title Insurance Company, (list continues on Attachment A to Civil Cover Sheet)

(b) County of Residence of First Listed Plaintiff **San Diego**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Stephen R. Basser, John L. Haeussler, Barrack, Rodos & Bacine, 402 West Broadway, Suite 850, San Diego, CA 92101 (619)230-0800

Attorneys (If Known)

'08 CV 0499 L WMc

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)

Brief description of cause: Class action for violation of the antitrust laws pursuant to Section 1 of the Sherman Act; violation of California Bus. and Prof. Code and Unjust Enrichment 15 U.S.C. § 1526

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 03/18/2008

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY**

RECEIPT # 148885    AMOUNT $ 350    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

SEI 3/18/08

CR